# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT, EASTERN DIVISION

James (Jim) Thunder Quill Wilson,
Plaintiff,


vs.

Dr. Gerald Stipanuk,
Barbara Buford,
Patsy Clark,
Mildred Adams,
Michael Petersen,
Dr. Ronald Turner,
Gayle Ray,
Debbie Inglis,
Flora Holland,
Ken Locke,
Pat Ryan,
Dean Yancy,
Tim Coleman,
Defendants.

**COMPLAINT**
**Jury Trial Requested**
No._____

09 MAR -4 PH 2:00

# COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
# UNDER 42 U.S.C. § 1983

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983.

1.      Plaintiff, James (Jim) Thunder Quill Wilson, *Pro-Se*, for his complaint, states as follows:

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action under 28 U.S.C. Sections 1331 and 1343 (3) and (4).

The matters of controversy arise under 42 U.S.C. Section 1983 to redress the deprivation, under color of

state law, of rights secured by the Constitution of the United States.

3.    Venue properly lies in this district pursuant to 28 U.S.C. section 1391(b)(2), because the events giving rise to this cause of action occurred at Hardeman County Correction Facility in the city of Whiteville, which is located within the Western District of Tennessee's Eastern Division.

## PARTIES

4.    Plaintiff James (Jim) Thunder Quill Wilson is and was currently incarcerated in Correction Corporation of America's Hardeman County Correctional Facility, located at 2250 Union Springs Road, P.O. Box 549, in Whiteville, Tennessee, 38075.

5.    Plaintiff James (Jim) Thunder Quill Wilson is and was at all times mentioned herein, an adult citizen of the United States, and a resident of the State of Tennessee.

6.    Defendant Gerald M. Stipanuk was at all relevant times described herein the Chief Health Provider for Correction Corporation of America's Hardeman County Correctional Facility, located at 2250 Union Springs Road, P.O. Box 549, in Whiteville, Tennessee, 38075. As the Chief Health Provider, Dr. Stipanuk diagnosed, prescribed medication, and oversaw inmates' medical care. Dr. Stipanuk's current mailing address is: Gerald Stipanuk, M.D., 1201 Bishop Street, Room 137, Union City, Tennessee, 38261. (Appendix One, (1) page.) [FN1]

7.    Defendant Barbara Buford is and was at all relevant times described herein, the Health Services Administrator for Correction Corporation of America's Hardeman County Correctional Facility, located at 2250 Union Springs Road, P.O. Box 549, in Whiteville, Tennessee, 38075. As Health Services Administrator, she "manages the facility's medical program activities and provides overall direction and leadership based on corporate goals, objectives, and philosophy in compliance with all applicable policies, laws, regulations, and standards." (Appendix Two, (6) pages.) Defendant's address is 2250 Union Springs Road, P.O. Box 549, in Whiteville, Tennessee, 38075. See (FN1), *supra*.

8.    Defendant Patsy Clark was, at all relevant times described herein, the Health Services Administrator for Correction Corporation of America's Hardeman County Correctional Facility, located at

---

[FN1] The Tennessee Court of Appeals held that CCA employees are not considered State employees. Younger v. State, 205 S.W.3d 499 (Tenn.Ct.App., 2006), perm. app. denied July 3, 2006. As the court noted, under the private prison contract of 1986, codified in Tenn.Code Ann. § 41-24-107(b), the State's sovereign immunity simply does not apply to private contractors. Id., at 499.

2

2250 Union Springs Road, P.O. Box 549, in Whiteville, Tennessee, 38075. As Health Services Administrator, she "manage[d] the facility's medical program activities and provides overall direction and leadership based on corporate goals, objectives, and philosophy in compliance with all applicable policies, laws, regulations, and standards." (Appendix Two, (6) pages.) Defendant's address is 555 Forest Avenue, Clinton, Tennessee, 38425. See (FN1), *supra.*

9. Defendant Mildred Adams is and was at all relevant times described herein, the Grievance Coordinator for Correction Corporation of America's Hardeman County Correctional Facility, located at 2250 Union Springs Road, P.O. Box 549, in Whiteville, Tennessee, 38075. Sergeant Adams was appointed by the warden for a (12) month term, not to exceed three consecutive terms. She has the authority to conduct investigations and hearings and ensure that all employees/inmates appear at the appropriate time for grievance hearings. She has the authority to cast a tie-breaking vote. She has the authority to ensure there will be no retaliation for filing grievances. Due to Sgt. Adams' retaliation against me for filing grievances and being an American Indian (Appendix Two-A), I filed a Title VI Civil Rights Complaint against her on January 6, 2009. (Appendix Two-B, (22) pages.) See (FN1), *supra.*

10. Defendant Michael Petersen is and was at all relevant times described herein the Chaplain for Correction Corporation of America's Hardeman County Correctional Facility, located at 2250 Union Springs Road, P.O. Box 549, in Whiteville, Tennessee, 38075. As he Chaplain of HCCF/CCA, he has many duties as described in Index # 118.01 (Appendix Three). See Index 118.01 IV, A; VI, B 1. a. d. f. See (FN1), *supra.*

11. Defendant Dr. Ronald Turner is and was at all relevant times described herein the Director of Religious Services and Chair of the Religious Activities Committee (hereinafter known as the R.A.C.) for the Tennessee Department of Corrections. His address is 320 6th Avenue North, 5th Floor, Rachel Jackson Office Building, Nashville, Tennessee 37243-0486.

12. Defendant Gayle Ray is and was at all relevant times described herein the Deputy Commissioner of the TDOC. Ray's address is 320 6th Avenue North, 6th Floor, Rachel Jackson Office Building, Nashville, Tennessee 37243-0486.

13.     Defendant Debbie Inglis is and was at all relevant times described herein General Counsel for the TDOC. Her address is 320 6th Avenue North, 6th Floor, Rachel Jackson Office Building, Nashville, Tennessee 37243-0486.

14.     Defendant Flora Holland is and was at all relevant times described herein Warden of Charles Bass Correctional Complex. Her address is 7177 Cockrill Bend Boulevard, Nashville, Tennessee 37243-3361.

15.     Defendant Ken Locke is and was at all relevant times described herein Assistant to Assistant Commissioner Reuben Hodge of the TDOC. His address is 320 6th Avenue North, 5th Floor, Rachel Jackson Office Building, Nashville, Tennessee 37243-0486.

16.     Defendant Pat Ryan is and was at all relevant times described herein Assistant to Assistant Commissioner Cathy Posey of the TDOC. His address is 320 6th Avenue North, 3rd Floor, Rachel Jackson Office Building, Nashville, Tennessee 37243-0486.

17.     Defendant Dean Yancy is and was at all relevant times described herein chaplain at Morgan County Correctional Complex. His address is P.O. Box 2000, Wartburg, Tennessee 37887.

18.     Defendant Tim Coleman is and was at all relevant times described herein chaplain at Turney Center Industrial Complex. His address is 1499 R.W. Moore Memorial Highway, Only, Tennessee 37140-4050.

19.     Defendants Ray, Inglis, Holland, Locke, Ryan, Yancy, and Coleman are all members of the R.A.C.

## PREVIOUS LAWSUITS

20.     Plaintiff has filed no other Federal lawsuits in Tennessee courts.

21.     Plaintiff has filed two Federal Habeas Corpus suits in the Southern District of Florida, challenging unlawful incarceration and an Indirect Criminal Contempt of Court conviction in Monroe County, Florida. The first Petition for Writ of Habeas Corpus was filed in early 1995 while Plaintiff was incarcerated in the Monroe County Jail in Key West, Florida. The Writ was dismissed. I do not have the

case number, but I believe U.S.D.J. Payne dismissed it. The next Writ I filed vacated my conviction on March 6, 2002. See Wilson v. Moore, 193 F.Supp.2d 1290 (S.D.Fla., 2002). (Appendix Four.)

22.    To the best of my knowledge I filed three (3) 42 U.S.C. 1983 Civil Rights Complaints in the Federal Court in the Northern District of Florida, in Tallahassee. One 1983 was dismissed, one 1983 proceeded to trial, and one 1983 was settled out of court. The only information I have on the dismissed 1983 is that it was a medical complaint, and I believe Magistrate Judge William Sherrill handled the Report and Recommendation, which was adopted by the U.S.D.J. A "strike" was imposed against me in this case. On March 7, 2001, Wilson v. Silcox, 151 F.Supp.2d 1345 (N.D.Fla., 2001) was decided and proceeded to trial on March 7, 2002. (Appendix Five.) On May 31, 2003, Wilson v. Moore, et al, 270 F.Supp.2d 1328 (2003) was decided. In mid-June, 2003, a negotiated monetary settlement was agreed upon (negotiator for Moore was A.A.G. Caryl Sue Kilinski, Civil Division, Tallahassee), and the case was dismissed. (Appendix Six.)

## PRELIMINARY MATTERS DESCRIBING THE CLAIMS SET FORTH BY THE PLAINTIFF

23.    There are five (5) separate departments that the claims in this 42 U.S.C. 1983 Civil Rights Complaint are filed against, and multiple defendants, as follows:

24.    The Medical Department at HCCF/CCA - Dr. Gerald Stipanuk; Health Services Administrator Barbara Buford; and Health Services Administrator Patsy Clark.

25.    The Dental Department at HCCF/CCA - Health Services Administrator Barbara Buford.

26.    The Grievance Procedure and Chairperson Office at HCCF/CCA - Sgt. Mildred Adams.

27.    The Religious Department at HCCF/CCA - Chaplain Michael Petersen.

28.    Tennessee Department of Corrections Religious Activities Committee - Dr. Ronald Turner, Ph.D.; Deputy Commissioner Gayle Ray; General Counsel Debbie Inglis; Warden Flora Holland; Mr. Ken Locke, Mr. Pat Ryan; Chaplain Dean Yancy; and Chaplain Dean Coleman.

29.    The following departments have violated the listed Constitutional Amendments and Federally enacted law:

30.     Medical Department - Eighth Amendment, Cruel and Unusual Punishment, Deliberate Indifference to Serious Medical Needs.

31.     Dental Department - Eighth Amendment, Cruel and Unusual Punishment, Deliberate Indifference to Serious Dental Needs.

32.     Grievance Procedure and Chairperson Office - First Amendment; Fifth Amendment; Fourteenth Amendment.

33.     Religious Department and Tennessee Department of Corrections Religious Activities Committee - First Amendment, Free Exercise of Religion; Religious Land Use and Institutionalized Persons Act; Equal Protection Clause of the Fourteenth Amendment; Eighth Amendment, Cruel and Unusual Punishment.

## STATEMENT OF FACTS IN CLAIM NUMBER ONE AGAINST DEFENDANTS STIPANUK, BUFORD, AND CLARK, MEDICAL DEPARTMENT

34.     The Plaintiff has attached fourteen (14) fully-exhausted administrative remedies filed against Defendants Stipanuk, Buford, and Clark, in which the statements of facts will be written from in part. All requests and grievances are specific, addressing the medical issues complete with dates, times, and documents as exhibits. Request forms will be utilized as exhibits supporting the Plaintiff's facts and claims, and will be listed in the Appendix. The exhausted administrative remedies span a period of at least thirteen (13) months. **All** administrative remedies denied the Plaintiff relief, resulting in a continued pattern of **habit and routine practice** (FN2) of the Defendants and Correction Corporation of America's **deliberate indifference** to my serious medical needs.(FN3)

35.     The Plaintiff entered the Tennessee Department of Corrections (hereafter referred to as the TDOC) on October 26, 2005, at Charles Bass Correctional Complex in Nashville, Tennessee, hereafter referred to as Charles Bass, and was transferred to Hardeman County Correctional Facility/ Corrections Corporation of America (hereafter referred to as HCCF/CCA) on December 21, 2005. During the medical

---

(FN2) Fed.R.Evid. Rule 406, Habit and Routine Practice.
(FN3) "Deliberate indifference to serious medical needs" violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976).

6

intake screening at Charles Bass, the Plaintiff was diagnosed and it was confirmed that he suffered from the Hepatitis C virus. The Plaintiff was assigned to the Chronic Clinic for Hepatitis C virus patients, and provided a document with information about Hepatitis C. (Appendix Seven.) The Plaintiff was told he would see a doctor once every six (6) months concerning his Hepatitis C virus. Since then, the Plaintiff has never seen a physician once for his Hepatitis C virus. I attended my first Chronic Clinic on November 2, 2005 at Charles Bass. My ALT and AST's regarding liver enzymes have been high "out of range" since the initial diagnosis, however, I have been refused the treatment with Interferon and Ribovarin because HSA Buford stated "per policy [I] do not qualify for Hepatitis C treatment (Appendix Seven -A), and it is at the doctor's discretion." (Appendix Eight, October 17, 2008 denied grievance, (14) pages, see page (2) of June 17, 2008 memo to Barbara Buford, re: Hepatitis C virus request, Id. at (1).) [FN4]

36.    On May 16, 2008, I filed a complaint to the Health Related Boards, mainly addressing eight (8) missing lab reports in my medical file. (Appendix Nine.) The lab reports were, in part, supposed to determine my ALT and AST liver enzyme levels. Ms. Buford responded to the complaint on July 21, 2008. (Appendix Ten.) Aside from her blatant lies in #2, #4, and #5 on page (1), she verified I never saw a doctor in 2006; Id., #3, page (1). In #4, she erroneously claims I was not diagnosed with Hepatitis C until February, 2007, which is clearly disputed by my medical record which indicates I was admitted to the Hepatitis C Chronic Clinic on November 2, 2005 at Charles Bass. I reviewed my medical file on April 7, 2008, and documented dates of the medical appointment, diagnoses, and events. (Appendix Eleven.)

37.    On May 28, 2008, I wrote Ms. Buford a request, requesting to know where my missing lab reports were. On June 17, 2008, Ms. Buford responded, stating she couldn't get any satisfactory answers from Lab One in Lenexa, Kansas. (Appendix Twelve.)

38.    On the same day, June 17, 2008, Ms. Buford also responded to one of my grievances. (Appendix Thirteen, July 29, 2008 denial by commissioner, (3) pages, see Response of Superior or Grieved Employee or Department.) Ms Buford re-asserted her position that she could not get a satisfactory answer, and that future lab work would be done at a local hospital. First, Ms. Buford obviously didn't get the answer she wanted, so she claimed simply that the answer was not

---

[FN4] See McKenna v. Wright, 386 F.3d 432, 437 (2nd Cir., 2004), denial of treatment for Hepatitis C based on prison policies violated Eighth Amendment.

**satisfactory**. Second, no local hospital has been utilized for my lab results since her June 17, 2008 claim; Lab One has been used.

39.    On February 28, 2006, I wrote a request, requesting to have my lab reports in regard to my enzyme levels concerning Hepatitis C read to me. (Appendix Fourteen, May 9, 2008 Assistant Commissioner denial, (6) pages; see Inmate Request.) Ms. Buford provided two separate responses, both illogical attempts at circular reasoning. My request was specific; I asked to have my lab results read. On March 24, 2008, in the Response of Superior or Grieved Employee or Department, Ms. Buford somehow turns my lab report request into a (her own) request for me to review my medical chart. That is clearly not on-point. Her second answer was dated January 2, 2008, and was an answer to a previous grievance. (See grievance number 15416/195881, Id. Response of Superior or Grieved Employee or Department, whereas Appendix Fourteen is grievance number 15629, id. Commissioner's denial.) Due to her talking in circles in the January 2, 2008 answer, I became concerned as to why I was having to write grievances to find out my lab report results. Ms. Buford indicated in the January 2, 2008 answer that lab results were not read to inmates unless they were abnormal. The fact is, mine were abnormal since I was diagnosed at Charles Bass. [FN5]

40.    On April 6, 2008, I wrote a grievance again requesting to have my lab results for Hepatitis C read to me. (Appendix Fifteen, June 17, 2008 Asst. Commissioner's denial, (8) pages; see Inmate Grievance.) On May 7, 2008, Ms. Buford responded and stated I had been referred to the Family Nurse Practitioner to review lab results. (Id. Response of Superior or Grieved Employee or Department.) When FNP LaShaun Connor finally read my lab results on June 10, 2008 (Appendix Sixteen), she confirmed my ALT/AST enzyme level was "Out of Range," rendering the results abnormal.

41.    On April 7, 2008, I was allowed to review my medical file. I discovered the following information:

A.    I was assigned to the Chronic Clinic for Hepatitis C virus on November 2, 2005, at Charles Bass.

---

[FN5] Burretti v. Wiscomb, 930 F.2d 1150, 1154 (6th Cir., 1991) The Eighth Amendment can be violated when failure to treat a prisoner results in pain, even if it does not result in worsening of the patient's condition. See also Brown v. Johnson, 387 F.3d 1344 (11th Cir., 2004), prisoner's HIV and Hepatitis were "serious medical needs" for purposes of his Eighth Amendment claim.

B.      On January 17, 2007 I arrived at Charles Bass because I was going to a Motion for New Trial Hearing on January 19, 2007 in Robertson County. I was assigned a bottom bunk as part of my Hepatitis C Chronic Clinic by Donald Webb per a count room memo. Barbara Buford claimed in her July 21, 2008 memo (Appendix Ten at #4) that I wasn't diagnosed and assigned to the Hepatitis C Chronic Clinic until February 2007. Ms. Buford has an established habit (Fed.R.Evid. Rule 406, Habit and Routine Practice) of lying, which I will continue to prove throughout this 42 U.S.C. 1983.

C.      On October 23, 2007, my ALT enzyme level was (67), and determined to be "out of range."

D.      On February 15, 2007, my glucose level was reported to be (250), more than (2½) times the normal range.

E.      On February 18, 2008, my glucose level was reported to be (324), more than (3) times the normal range. (The normal range of glucose levels is (60-110).) A person can slip into a diabetic coma at around (360).

F.      **I was never notified that my glucose level was extremely elevated. I would never have known without reviewing my medical file on April 7, 2008. (Appendix Eleven.)** [FN6] As of February 15, 2007, the Defendants were fully and subjectively aware of a serious risk to my health due to my glucose levels being extremely elevated. The Defendants chose not to notify me of my diabetic condition or to treat me for it until I brought it to their attention after I reviewed my medical file. Defendant Buford and Defendant Clark are required under their Health Services Administrator Job Code 1010 (Appendix Two) to:

G.      Audit medical files for documentation of all provided services; Id. page (2), bullet #(10), and closely monitor all potential catastrophic illnesses, Id. page (3), bullet #(1). Being that both Defendants Buford and Clark had the duties described herein, they were fully aware that my

---

[FN6] See Farmer v. Brennan, 114 S.Ct. 1970, 1974 (1994). A prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment. See Helling v. McKinney, 113 S.Ct. 2475 (1993); Wilson v. Seiter, 111 S.Ct. 2321 (1991); and Estelle v. Gamble, 97 S.Ct. 285 (1976).

glucose level was extremely elevated as far back as February 15, 2007. Of course it probably was before then, but the 2006 lab reports vanished.

42. On May 20, 2008 (Appendix Seventeen) and on May 27, 2008 (Appendix Eighteen), I wrote Dr. Crismaru and Barbara Buford requests seeking information as to why Defendant Dr. Stipanuk did not notify me that my glucose level was extremely elevated, inter alia. Ms. Buford answered both requests, claiming **she did not know why I wasn't notified**, and **she did not know why Dr. Stipanuk didn't begin treating me when he found out my glucose level was extremely elevated**. Ms. Buford lays all the blame on Dr. Stipanuk, even though she was aware of my extremely elevated glucose level as well, because she reviewed my files in conjunction with her job requirements. (Appendix Two.) [FN7]

43. On May 20, 2008, I wrote Dr. Crismaru a request inquiring into my Hepatitis C virus labwork drawn on either February 18, 2008 or February 19, 2008. (Appendix Seventeen.) On May 25, 2008, I wrote a grievance because Dr. Crismaru refused to respond to the request. That grievance is encompassed in Appendix Nineteen, the Assistant Commissioner's denial on July 8, 2008. (Appendix Nineteen, (6) pages.) RN Darryl LaFarlette, RN, Assistant Health Services Administrator, responded on June 9, 2008 stating "I cannot explain any actions of Dr. Stipanuk who is no longer here." (Id. nineteen, Response of Superior or Grieved Employee or Department.) This response is not based on any sound medical evidence or conclusions. It's common, widespread knowledge at HCCF/CCA that inmates go untreated to **save CCA money**.[FN8]

44. On April 8, 2008, I wrote Dr. Stipanuk or in the alternative the new doctor and requested to know why I have not been seen by a doctor for my Hepatitis C virus Chronic Clinic concerns. The request is encompassed in the Assistant Commissioner's denial, dated May 12, 2008, (5) pages. (Appendix Twenty.) Ms. Buford responded, insisting an FNP runs the Chronic Clinic and all criteria had been met. (Id., Response of Superior or Grieved Employee or Department.) Ms. Buford also insists she did not

---

[FN7] Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir., 2002). Although the Plaintiff bears the onerous burden of proving the officials' subjective knowledge, this element is subject to proof by "the usual" ways. Farmer, 511 U.S. at 842, 114 S.Ct. 1970. Thus, the Supreme Court noted it was permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge. Id., at 842, 114 S.Ct. 1970. Moreover, the court warned, a prison official may not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.

[FN8] Boswell v. Sherborne County, 849 F.2d 1117, 1123 (8th Cir., 1986). Budgetary restrictions that interfere with inmates' medical treatment can violate the Eighth Amendment.

10

receive the April 8, 2008 request. However, as the reviewing court can clearly see, I make copies of all requests and grievances I file marked "cc: File" on each document for occasions like Ms. Buford's lie that she did not receive the request. (See April 8, 2008 request for page (5) of (5), Appendix Twenty.) As this court will see from reviewing Ms. Buford's responses, she frequently says she didn't receive the request or she was out sick, inter alia.

45.   On April 11, 2008, I wrote Dr. Crismaru a request, inquiring about my missing lab reports. (Appendix Twenty-One.) I wrote basically the same request on April 12, 2008 to Dr. Crismaru. (Appendix Twenty-Two.) Ms. Buford put her answer to both requests on the April 11, 2008 request, indicating "see attached" on the April 12, 2008 request. On April 21, 2008, Ms. Buford called me to her office to discuss the lab reports, **insisting she will obtain copies of the missing lab results**. (Appendix Twenty-One.) (Appendix Twenty-Three, Inmate Pass.)

46.   On April 30, 2008, I was located at work by Medical, and instructed to report to Medical. I arrived at Medical at 11:57 AM. (appendix Twenty-Four.) Nurse Baggett showed me five (5) lab reports and requested me to review them. As it turned out, only the report on top was mine. I reviewed all five lab reports and found that the other four reports belonged to another James Wilson who was at DeBerry Special Needs Prison. The other James Wilson had a Georgia Social Security Number from Blackshear, Georgia. Of course, this was an attempt by Barbara Buford to cover up the fact that blood drawn here at HCCF/CCA is routinely discarded and turns up missing because CCA does not want to incur the cost for lab work done by Lab One, 10101 Renner Blvd., Lenexa, Kansas 66219. Two (2) other inmates wrote affidavits about their drawn blood disappearing. (Appendices Twenty-Five and Twenty Six.) Mr. Jordan was told his blood disappeared from an unattended shipping dock. (Id. Affidavit.) What kind of Medical Department would place a refrigerated cooler full of blood unattended on a prison shipping dock? Vampires?

47.   Barbara Buford called me to her office on May 13, 2008 at 9:38 A.M. (Appendix Twenty-Seven.) At that meeting, Ms. Buford assured me, yet again, that she would locate **my** lab results and allow me to review them ASAP. I inquired as to why she had tried to "hoodwink" me by showing me a cover page which was my lab report, while the following lab reports belonged to James Wilson from Blackshear,

Georgia. She changed the subject and told me her Tequila consumption had increased because I had written so many requests and grievances about my lab reports, not being advised for (16) months that I had type 2 Diabetes, and about my Hepatitis C virus Chronic Clinic, and that I had become a real pain to her and her medical staff. [FN9]

48.    On May 6, 2008, I wrote a grievance because Ms. Buford would not answer my April 30, 2008 questions about why I was shown five (5) lab reports but only one (1) was mine. (Appendix Twenty-Eight, (6) pages; see pages (3, 4, and 6).) Ms. Buford acknowledged that she discussed the lab reports with me. (Page (5), Response of Superior or Grieved Employee or Department.)

49.    On May 19, 2008, I wrote a five (5) page grievance addressing the missing lab reports, not being notified by the Defendants (ever until I found out by reviewing my medical file on April 7, 2008) that my glucose level was dangerously elevated since at least February 19, 2008 (a fifteen (15) month delay), not being treated for Hepatitis C virus, and deliberate indifference to my serious medical needs. (Appendix Twenty-Nine, (16) pages). (See Grievance encompassed in Appendix Twenty-Nine.) In Barbara Buford's "Response of Superior or Grieved Employee or Department," she claims I am diagnosing and prescribing for myself. She did not address one single issue, yet she was put on notice as far back as November 19, 2007 that I was concerned about my lab results. (See November 19, 2007 Inmate Request encompassed in Appendix Twenty-Nine.) Although I signed up time and time again, my blood results were not read to me until June 17, 2008, when Dr. Crismaru verified my ALT/AST was elevated, "out of range" concerning Hepatitis C virus, (Appendix Thirty). In between November 19, 2007 (first request) and July 17, 2008, when Dr. Crismaru read my lab results, I wrote three (3) more requests on February 28, 2008, April 8, 2008, and May 1, 2008, requesting lab results and signed up for sick call. Each time I went to sick call, I was told I would be "called for" when the Doctor or FNP became available. As noted, I was finally "called for" on July 17, 2008, a delay of (239) days or seven (7) months and (19) days. (See Request Forms encompassed in Appendix Twenty-Nine.)

50.    On June 2, 2008, I wrote Ms. Buford a request in order to be prescribed a modified diet due to my diabetic condition. (Appendix Thirty-One, (9) pages.) The June 2, 2008 request is encompassed in

---

[FN9] Hughes v. Joliet Correctional Center, 931 F.2d 425, 428 (7th Cir., 1991). Evidence that a medical staff treated the plaintiff "not as a patient, but as a nuisance."

Appendix Thirty-One. Ms. Buford, in keeping with her habit and routine practice (Fed.R.Evid. Rule 406) failed to timely respond, therefore I wrote a grievance on June 8, 2008. (Id. Appendix Thirty-One.) Ms. Buford responded, saying I would have to see the MD or FNP for a special diet. (Id. Response of Superior or Grieved Employee or Department.)

51.    On June 12, 2008 I was seen by FNP LaShaun Connor for my newly-discovered diabetic condition, (Appendix Thirty-Two), I requested to be prescribed a modified diet because of my diabetic condition and the fact that my prescribed diabetic medication "Glyburide" mandates people who take it **must** follow a prescribed, modified diet. I presented page (608) from the American Medical Association Encyclopedia to Ms. Connor. It states that "people who take Glyburide **must** follow prescribed diet and exercise regimens." That document is listed as Exhibit Five in the grievance I wrote the following day, June 13, 2008 (Appendix Thirty-Three, (21) pages.) Regarding the denial of a prescribed diet, Ms. Buford's answer was that only Insulin-dependent diabetics got special diets. (See Response of Superior or Grieved Employee or Department.) That simply is not true. Many inmates at HCCF/CCA have prescribed special diets for a variety of reasons. For instance, Timothy Hutson has a prescribed special diet to control his cholesterol. (Appendix Thirty-Four, Affidavit of Timothy Hutson, 395679, and Medical Prescribed Special Diet, Appendix Thirty-Five.) Yet again, Barbara Buford has lied about medical issues. (Fed.R.Evid. Rule 406.)

52.    In the grievance in Appendix Thirty-Three, I clearly put the Defendant on notice that my prescribed medication, Glyburide, demanded a modified diet, yet all Defendants ignored that fact.[FN10] The Defendants are deliberately indifferent to my serious medical needs for a modified, nutritious diet in compliance with my prescribed Glyburide medication.

53.    On June 26, 2008, I wrote Ms. Buford a request reminding her of the two June 17, 2008 documents I personally placed in her hands as a meeting she and I had on June 17, 2008. (Appendix Thirty-Six, (9) pages.) The request and June 17, 2008 documents are encompassed in Appendix Thirty-

---

[FN10] Johnson v. Harris, 479 F.Supp. 333, 338 (S.D.N.Y. 1979). Courts have been particularly responsive to prisoner's complaints about inadequate dietary conditions. In Kahane v. Carlson, 527 F.2d 492 (2nd Cir., 1975), for example, the Second Circuit upheld a mandatory injunction requiring prison authorities to provide an Orthodox Rabbi with meals "consistent with [his] religious scruples." If the Constitution requires prison wardens to provide a religiously satisfying diet, it must also require that it is physically nourishing.

Six. D.R. Mills, Program Director, responded on July 8, 2008, claiming Ms. Buford has answered all of my requests. (Id. Response of Superior or Grieved Employee or Department.) I presented (8) requests to Ms. Buford for medical care on June 17, 2008. To this date, only numbers three (3), five (5), and eight (8) have been addressed. I did get glasses, Id. (3). I was finally given a flu shot after filing grievances about it, but only got the shot on January 9, 2009, (2) months into the Flu season. Finally, I was prescribed Zantac on November 26, 2008, but the Zantac was not renewed by Doctor Cole and expired on January 26, 2009.[FN11] I went to sick call as I was told to do by Nurse Gates to get my Zantac renewal on February 3, 2009 (Appendix Thirty-Seven). I was told by the attending sick call nurse that FNP LaShaun Connor would renew my Zantac and I would have them in a couple of days. On February 10, 2009, I was at medical to assist Inmate Artis Whitehead review his medical file (Appendix Thirty-Eight). At medical, I saw and spoke to FNP Connor about my Zantac renewal. She told me she had no idea what I was talking about and I would have to see a doctor to get a renewed Zantac prescription. I reminded her that HCCF/CCA does not have a doctor employed at this time, and hasn't since Dr. Crismaru quit on December 2, 2008, and Doctor Cole had recently been hired, worked two weeks, and quit. FNP Connor told me she had no idea when a new doctor would be hired, and I should buy Tums from commissary. I immediately wrote Ms. Buford a request and attached a typed letter to it. (Appendix Thirty-Nine, (2) pages). Deliberate indifference to serious medical needs is common practice by all medical staff here at HCCF/CCA.

54.    On September 3, 2008, I typed HSA Buford a letter in regard to the Diabetic Glucose Level monitoring machines and associated problems with obtaining an accurate reading (Appendix Forty, (9) pages). The September 3, 2008 letter is encompassed in Appendix Forty. Of course, and in keeping with the Habit and Routine Practice, she failed to timely respond, so I wrote a grievance on September 22, 2008 (Id. Appendix Forty). Ms. Buford finally responded on September 22, 3008, claiming "all is well" with the Glucose Monitoring machines, even though the levels swing in excess of 122 points from one stick to the next in less than one minute. (See my September 3, 2008 letter, paragraph (3), (122) point swing.)

---

[FN11] Greeno v. Daley, 414 F.3d 643, 653 (7th Cir., 2005) Heartburn is a serious medical need.

14

55.     Way back on September 9, 2008, I went to sick call and spoke to Nurse Goodman about my suspected throat cancer. Ms. Goodman told me I would be put on the list to see Dr. Crismaru. I thanked her and departed. On November 6, 2008, I wrote Ms. Buford, requesting to know why I have not seen the doctor yet for my serious medical need, possible throat cancer. (Appendix Forty-One.) She responded on November 12, 2008, claiming I would be seen ASAP. I also provided Ms. Buford an online Throat Cancer Guide, explaining I had a persistent cough which does not go away due to cold. (Appendix Forty-Two.) That is exactly what I told Nurse Goodman on September 9, 2008, at sick call. I wrote Ms. Buford another request on December 9, 2008, requesting to know why I hadn't been seen by a doctor. (Appendix Forty-Three.) Ms. Buford responded on December 25, 2008, and stated my request and throat cancer complaint was "bogus."[FN12] (Id. Appendix Forty-Three.) I then wrote a grievance in response to Ms. Buford referring to my possible throat cancer as "bogus." (Appendix Forty-Four, (2) pages.) I had previously written another grievance on January 4, 2009, addressing my suspected throat cancer. (Appendix Forty-Five, (2) pages.)

56.     On February 4, 2009, Ms. Buford called me to her office at 4:46 as a result of reported phone calls from people in Nashville who were wanting to know why I have not seen a doctor in over (5) months, when I went to sick call on September 9, 2008. (Appendices Forty-Six and Forty-Seven.) Ms. Buford told me she wanted a witness to our conversation, so she invited Ms. Gates to attend. The meeting lasted for (26) minutes. (Id., Appendix Forty-Six.) Ms. Buford wanted to know what it was going to take for me to stop the phone calls to her. I told her simply set me an appointment to see a throat specialist and in the meantime, x-ray my throat. She agreed to do both. We discussed many other medical and non-medical issues and I departed. I trusted Ms. Buford on her word. That was a mistake. On February 20, 2009, I was called to medical at 7:51 AM for an x-ray. (Appendix Forty-Eight.) The x-ray tech prepared my x-ray. I was given an x-ray for lungs and heart, not a throat x-ray. I confirmed this with the x-ray tech, Mr. Tripod. I should have been given what is known as a cervical spine x-ray which x-rays the esophagus, which is approximately (18) inches long. I wrote Ms. Buford immediately on February 10, 2009, and explained this to her. (Appendix Forty-Nine, (2) pages.) Ms. Buford kept her Habit and Routine

---

[FN12] Merry Christmas!

Practice (Fed.R.Evid.Rule 406) and blatantly lied, claiming I saw the FNP when I did not. My medical record will prove she lied again. (Appendix Fifty.) [FN13]

57.     An example of how HSA Barbara Buford tells so many lies that she doesn't even remember her own written lies is demonstrated in Appendix Fifty-Two. (See Appendix Fifty-Two, (11) pages.) In my August 13, 2008 grievance against Ms. Buford I described how she claimed two completely different things about my diabetic finger-stick clinic in two different writings in a mere (18) days. On July 21, 2008, Ms. Buford sent me a (2) page typed document addressing my medical concerns. In #5, she states I was ordered "Finger-stick blood sugar checks **twice daily.**" (Id. July 21, 2008 letter encompassed in Appendix Fifty-Two.) On August 6, 2008, I wrote Ms. Buford a request inquiring, inter alia, about my finger stick clinic. (Request encompassed in Appendix Fifty-Two.) In her response on July 8, 2008, she stated my order for finger stick was **twice weekly**. (Id. Request.) In the U.S. Navy, my ship had what's know as a Plan of the Day, or P.O.D. Ms. Buford's P.O.D. and modus operandi is lying in an attempt to cover up other lies. She is a habitual liar, and I have established that in this 42 U.S.C. 1983 that she has a Habit and Routine Practice of lying. (Fed.R.Evid.Rule 406, Habit and Routine Practice.) The deliberate indifference to my serious medical needs are, in part, a direct result of Ms. Buford compounding lie upon lie. As Chief Justice Harlan said in In Re Winship, 90 S.Ct. 1068 (1969):

> "A lie is a lie, no matter what the subject."

## EXHAUSTION

58.     I wrote Ms. Buford a request on June 11, 2008 to find out if Patsy Clark was the Health Services Administrator at HCCF/CCA when my glucose level was reported to be 250. Ms. Buford responded "yes." (Appendix Fifty-Three.)

59.     Plaintiff has exhausted all available administrative remedies regarding the matters described in this complaint against defendants Stipanuk, Buford, and Clark. Copies of Plaintiff's grievances and appeals are attached to this complaint and listed in the Appendix as numbers eight, thirteen, fourteen,

---

[FN13] See Jones v. Bock, 127 S.Ct. 910 (2007), Id. Holdings (1), (2), and (3), cover page (Appendix Fifty-One).

fifteen, nineteen, twenty, twenty-eight, twenty-nine, thirty-one, thirty-three, thirty-six, forty, fifty, and fifty-two. All grievances and appeals were denied.

## STATEMENT OF CLAIM FOR DEFENDANTS
## STIPANUK, BUFORD, AND CLARK IN CLAIM ONE

60.    Corrections Corporation of America (C.C.A.) and their employees are under contract with Hardeman County to manage Hardeman County Correctional Facility, or as stated in Hicks v. Campbell, (S.W.3d, 2003 WL 22438441 Tenn.Ct.App. 2003) "Hardeman County Correctional facility in Whiteville, Tennessee, is a private facility operated by C.C.A. under contract with Tennessee Department of Correction."

61.    Corrections Corporation of America and their employees are obligated under the Eighth Amendment to provide prisoners with adequate medical care. The Supreme Court has interpreted the Eighth Amendment's prohibition of cruel and unusual punishment through the fourteenth Amendment, as imposing a duty on the states [which is inherited by C.C.A.\H.C.C.F. and their employees via contractual agreement to manage state correctional facilities] to provide medical care to incarcerated individuals. This principle applies regardless of whether the medical care is provided by governmental employees or by private medical staff under contract with the government. C.C.A. and their employees violated their inherited responsibility to provide the Plaintiff, who is housed in their facility, with adequate medical care for his serious medical needs. Plaintiff's statement of facts and claims clearly demonstrates a medical treatment, or lack thereof, that can only be described as inadequate, inhumane, deliberately indifferent, and draconian, all a violation of Plaintiff's Eighth Amendment Right.

62.    Corrections Corporation of America's Dr. Gerald Stipanuk, Health Services Administrator Barbara Buford, and HSA Patsy Clark are not State employees. "The sovereign immunity of the state shall not apply to the contractor. Neither the contractor nor the insurer of the contract may plead the defense of sovereign immunity in any action arising out of the performance of the contract." Martin v. State, S.W.3d 2001 WL 747640 (Tenn.Ct.App. 2001).

17

63.    Defendant Dr. Gerald Stipanuk was deliberately indifferent to the Plaintiff's diagnosed serious medical needs, involving Hepatitis C virus and Type Two Diabetes. Dr. Stipanuk failed to keep the Plaintiff informed about his "out of range" enzyme level (ALT, AST) regarding his Hepatitis C virus. Dr. Stipanuk was deliberately indifferent to Plaintiff's serious medical needs involving Hepatitis C virus when he refused to adequately treat the Plaintiff with injections of Interferon, and Ribovarin tablets, and by refusing to order the Plaintiff a liver biopsy. Dr. Stipanuk was deliberately indifferent to the Plaintiff's serious medical needs involving Type Two Diabetes. Dr. Stipanuk knew as early as February 19, 2007 that the Plaintiff's glucose level was extremely elevated, with a lab report indicating Plaintiff's glucose level was at 250. Dr. Stipanuk decided not to advise the Plaintiff that his glucose level was extremely elevated and the Plaintiff needed medication to control his glucose level. The refusal of Dr. Stipanuk to adequately treat the Plaintiff's Hepatitis C virus and Type Two Diabetes was/is deliberate indifference to his serious medical needs and a violation of the Eighth Amendment of the United States Constitution. The deliberate indifference resulted in unnecessary pain and physical injury to the Plaintiff.

64.    Defendant Barbara Buford was deliberately indifferent to the Plaintiff's diagnosed serious medical needs, involving Hepatitis C virus and Type Two Diabetes. Ms. Buford failed to keep the Plaintiff informed about his "out of range" enzyme level (ALT, AST) regarding his Hepatitis C virus. Ms. Buford was deliberately indifferent to Plaintiff's serious medical needs involving Hepatitis C virus when she refused to adequately treat the Plaintiff with injections of Interferon, and Ribovarin tablets, and by refusing to order the Plaintiff a liver biopsy. Ms. Buford was deliberately indifferent to the Plaintiff's serious medical needs involving Type Two Diabetes. Ms. Buford knew as early as February 19, 2007 that the Plaintiff's glucose level was extremely elevated, with a lab report indicating Plaintiff's glucose level was at 250. Ms. Buford decided not to advise the Plaintiff that his glucose level was extremely elevated and the Plaintiff needed medication to control his glucose level. The refusal of Ms. Buford to adequately treat the Plaintiff's Hepatitis C virus and Type Two Diabetes was/is deliberate indifference to his serious medical needs and a violation of the Eighth Amendment of the United States Constitution. The deliberate indifference resulted in unnecessary pain and physical injury to the Plaintiff. [FN14]

---

[FN14] Ms. Buford also displayed a continuous pattern of lying in the request responses, grievance responses, and her letters described in paragraphs (35-57) of the complaint. Her Habit and Routine Practice of lying is clearly established herein. Fed.R.Evid. Rule 406, Habit and Routine Practice.

65.    Defendant Patsy Clark was deliberately indifferent to the Plaintiff's diagnosed serious medical needs, involving Hepatitis C virus and Type Two Diabetes. Ms. Clark failed to keep the Plaintiff informed about his "out of range" enzyme level (ALT, AST) regarding his Hepatitis C virus. Ms. Clark was deliberately indifferent to Plaintiff's serious medical needs involving Hepatitis C virus when she refused to adequately treat the Plaintiff with injections of Interferon, and Ribovarin tablets, and by refusing to order the Plaintiff a liver biopsy. Ms. Clark was deliberately indifferent to the Plaintiff's serious medical needs involving Type Two Diabetes. Ms. Clark knew as early as February 19, 2007 that the Plaintiff's glucose level was extremely elevated, with a lab report indicating Plaintiff's glucose level was at 250. Ms. Clark decided not to advise the Plaintiff that his glucose level was extremely elevated and the Plaintiff needed medication to control his glucose level. The refusal of Ms. Clark to adequately treat the Plaintiff's Hepatitis C virus and Type Two Diabetes was/is deliberate indifference to his serious medical needs and a violation of the Eighth Amendment of the United States Constitution. The deliberate indifference resulted in unnecessary pain and physical injury to the Plaintiff. [FN15]

## STATEMENT OF FACTS IN CLAIM NUMBER TWO
## THE DENTAL DEPARTMENT, DEFENDANT BARBARA BUFORD,
## HEALTH SERVICES ADMINISTRATOR

66.    I have been on the list with Dental to have my teeth cleaned since October 24, 2007. Approximately one year later, I wrote a request on October 20, 2008 to Dental inquiring as to when I will have my teeth cleaned. (Appendix Fifty-Four.) On October 22, 2008 I received a response with four inadequate answers, none of which advised me of when my teeth will be cleaned. [FN16]

67.    After one year and four months of waiting for my teeth to be cleaned, I finally wrote a grievance about my lack of Dental care on February 13, 2009. (Appendix Fifty-Five, (2) pages.) See (FN13), *supra.*

---

[FN15] Defendant Patsy Clark transferred to South Central Correctional Facility in March, 2007. Defendant Barbara Buford replaced Ms. Clark.

[FN16] Ramus v. Lamm, 639 F.2d 559, 576 (10th Cir., 1981) Dental care is one o the most important medical needs of inmates.

## STATEMENT OF CLAIM FOR DEFENDANT BUFORD
## IN CLAIM TWO

68.     Defendant Buford is the Health Services Administrator for HCCF/CCA. As part of her job requirement, she is to ensure inmates at HCCF/CCA receive adequate dental care. I have not received any dental care, much less adequate dental care, although I have been on the dental list to have my teeth cleaned since October 24, 2007, approximately (16) months now. Defendant Buford was/is deliberately indifferent to my serious dental needs, a violation of the Eighth Amendment to the United States Constitution. [FN17]


## STATEMENT OF FACTS IN CLAIM NUMBER THREE
## AGAINST GRIEVANCE CHAIRPERSON SERGEANT MILDRED ADAMS

69.     Grievance Chair person Mildred Adams retaliated against me for writing grievances, for being an American Indian, and for running in the election to be a member of the Grievance Committee that conducts grievance hearings. As a result of the retaliation, I filed a Title VI Civil Rights Complaint against her on January 6, 2009. (See Appendix Two B, (22) pages.) [FN18] The Title VI Civil Rights Complaint was filed with six (6) agencies and through the HCCF/CCA grievance procedure, according to HCCF/CCA policy. The Title VI was sent to Assistant Warden Dodd and is still pending at the time of this 42 U.S.C. 1983.

70.     Grievance Chairperson Sergeant Mildred Adams has a well-established Habit and Routine Practice (Fed.R.Evid. Rule 406) of returning grievances, claiming the grievance contains multiple issues when, in fact, the grievances **do not** contain multiple issues, but only **multiple facts** describing **one issue**. Sgt. Adams routinely for HCCF/CCA utilized her habits and returned my grievances for other reasons, to include "not enough details," claimed I medically diagnosed myself, same or similar grievances had been previously filed, and grievance was filed post (7) days, although all of my

---

[FN17] As a diabetic chronic clinic patient, I am supposed to have my teeth cleaned at least once per year.

[FN18] Wilson v. Silcox, 151 F.Supp.2d 1345, 1351 (N.D. Fla., 2001). It is well-settled that "prison officials may not retaliate against an inmate for exercising a constitutionally protected rights." See also Watkins v. Kasper, 560 F.Supp.2d 691, 694 (N.D. Ind., 2008). An action taken in retaliation for the exercise of a constitutionally protected right is actionable under 1983 even if the act, when taken for a different reason, would have been proper. This includes retaliation against an inmate for exercising his constitutional right to access the courts or to use the prison grievance system.

grievances were timely filed. See grievances in Appendix herein; also see Appendices Fifty-Six through Seventy-One, grievances that were filed and finally exhausted but not utilized in this 42 U.S.C. 1983.

71.     Between November 2007 and February of 2009, I am aware of at least forty grievances I wrote concerning medical issues, religious issues, dental issues, and Grievance Chairperson issues while at HCCF/CCA. Not a single one has been granted; all were denied, and 90% of them were returned by Sgt. Adams for one erroneous reason or another. (Re: Paragraph #70, Appendices.)

72.     In Wilson v. Silcox, 151 F.Supp.2d 1345 (N.D. Fla., 2001, Appendix Five) I wrote approximately (20) grievances and not a single one was deemed inappropriate. In Wilson v. Moore, 270 F.Supp.2d 1328 (N.D. Fla., 2003) I wrote approximately (75) grievances over a four (4) year period and not one single grievance was returned for any reason, much less being inappropriately written. Sgt. Adams utilizes the grievance procedure here to protect HCCF/CCA employees from having to answer legitimate questions and issues presented in their grievances, and denies them access to court. She has particularly manipulated the grievance procedure in the grievances I have filed.

73.     As of the filing of the claim against Sgt. Adams, I have filed six (6) grievances directly against her for abuse and manipulation of the grievance procedure, and against her for being uneducated in that she cannot, or will not, distinguish the facts of a grievance from a single issue in each grievance. Four of the grievances have never been responded to (apparently shredded by Sgt. Adams). These are Appendices Seventy-Two, Seventy-Three, Seventy-Four, and Seventy-Five. See (FN13), supra. Two grievances were exhausted against Sgt. Adams. (Appendices Seventy-Six and Seventy-Seven.)

74.     Appendix Seventy-Five is particularly interesting because it describes how Sgt. Adams threatened another inmate, Timothy Hutson, #395679 (see Affidavit by Hutson, encompassed in Appendix Seventy-Five) because I wrote Mr. Hutson's grievance for him. My job description as a legal aide, signed August 17, 2006, titled "Job Schedule/Expectations," clearly indicates it is my job to assist inmates with filing grievances, Id. 2. (See Appendix Seventy-Five, which has Job Schedule/Expectations attached.) Mysteriously, that grievance has not been responded to and has apparently been shredded or discarded by Sgt. Adams. Although these grievances are not exhausted, they are ripe for review, see

21

(FN13), *supra*, and because two grievances bearing the same subjects have been exhausted. (Appendices Seventy-Six and Seventy-Seven.) [FN19]

75.    On August 4, 2008, I filed a grievance against Sgt. Adams for denying my request for Edna Bryant to present live testimony at a scheduled grievance hearing on June 30, 2008. (Appendix Seventy-Six, (17) pages. August 4, 2008 grievance encompassed in Appendix Seventy-Six.) On two separate and distinct occasions, Sgt. Adams, prior to the hearing, told me I could not have witnesses at my hearing (Id. grievance). I spoke to both Assistant Wardens Dodd and Kendrix, and they both confirmed I could have Edna Bryant present live testimony at my hearing (Id. grievance). I also presented page (8), Second Level of Review to Sgt. Adams and showed her where it clearly indicates I could have Ms. Bryant present as a witness. (Id. page (8), Second Level of Review, paragraph one, encompassed in Appendix Seventy-Six.) I specifically handed Sgt. Adams my witness list on July 28, 2008. (Id. July 28, 2008 witness list, encompassed in Appendix Seventy-Six.) Sgt. Adams refused to allow me to present witnesses, especially the most important witness, Edna Bryant. At the hearing, I submitted four (4) questions to be asked of Ms. Bryant via telephone. (Id. "To: Edna Bryant," encompassed in Appendix Seventy-Six.) I also submitted questions to both Assistant Wardens. (Id. "questions," encompassed in Appendix Seventy-Six.) Neither warden was called and asked questions by Sgt. Adams. I also submitted questions to Sgt. Adams' two clerks, John Duncan and Brandon Lapham. (Id. Appendix Seventy-Six.) All questions were answered by Duncan, confirming my positions. Although Sgt. Adams told me in front of the two clerks and the hearing committee that all four (4) of the questions I set forth to Edna Bryant would be asked, she lied, and only asked Ms. Bryant two (2) of the four (4) questions. Ms. Bryant confirmed she was only asked two (2) questions in a six (6) page questionnaire I presented her. (See Questions for Edna Bryant, six questions, in Appendix Seventy-Six.) In question #(6) to Ms. Bryant, she verified she was only asked two questions. [FN20]

---

[FN19] Amazingly, all of my other grievances were processed in regard to medical issues (claim one) and religious issues (claim four), but only two of the six grievances against Sgt. Adams made it through the grievance procedure and to the Assistant Commissioner's office in Nashville. As previously discussed herein, before I mail any request forms or grievances, I make copies of them. The missing grievances were timely filed by placing them in the prison mailing system. Houston v. Lack, 108 S.Ct. 2379 (1989).

[FN20] Constitutional protections such as the Sixth Amendment's confrontation clause and the Fifth and Fourteenth Amendments' Right to Due Process are not lost behind prison walls.

76.    On August 15, 2008, I wrote a grievance against Sgt. Adams for her arbitrary, capricious, unsupported, discriminatory practices and illogical decisions in regard to the grievance procedure, in which she is the chairperson. (Appendix Seventy-Seven, seven (7) pages.) Sgt. Adams returns grievances based on a number of unsupported reasons, only for her defacto determination, with no plausible explanation. She often returns grievances claiming they were filed outside the (7) day limit, when in fact they were timely filed. (See Appendix Seventy-Seven.) She not only cannot add and subtract simple math, she cannot distinguish facts which describe an issue from the issue itself, and regularly returns proper grievances, claiming they have multiple facts when they don't. I recently spoke to Assistant Chairperson C.O. Wilson, and she told me she and Sgt. Adams had discussed the fact/multiple issue problem on many occasions, to the point of arguing about it, and that Sgt. Adams just simply can't distinguish facts from issues. This conversation took place on or about January 29, 2009.

## STATEMENT OF CLAIM FOR DEFENDANT ADAMS IN CLAIM THREE

77.    It is not a crime to be uneducated. However, it is not appropriate or logical to appoint a Grievance Chairperson to that position who cannot calculate simple math or distinguish the issues from the facts describing the issues. The foregoing statement describes Defendant Mildred Adams.

78.    Sgt. Adams utilizes unsupported reasons, defacto tactics, erroneous decisions, illogical decisions, in a arbitrary and capricious manner, in her position as Grievance Chairperson. The result of her behavior has denied me adequate answers in the grievance procedure, which in turn denies me proper and full answers to present to a court for the redress of injury, thereby denying me my First Amendment Constitutional Right to access courts, and Freedom of Speech. (U.S.C.A. One.)

79.    The same methods and behavior utilized by Sgt. Adams in paragraphs (69-76) also have denied me my Sixth Amendment Constitutional Right to compulsory process and the Confrontation Clause to present a witness at a June 30, 2008 Grievance Committee Hearing. (U.S.C.A. Six.)

80.    Sgt. Adams has denied me my Constitutional Rights to Due Process of Law under the Fifth and Fourteenth Constitutional Rights by her acts and omissions described in paragraphs (69) through (76). (U.S.C.A. Five and Fourteen.)

23

## EXHAUSTION

81.   Plaintiff has exhausted all available administrative remedies regarding the matters described in this complaint against Defendant Adams. Copies of the Plaintiff's grievances and appeals are attached to this complaint and listed in the Appendix as Appendices Seventy-Six and Seventy-Seven.

## COMMENTARY

82.   Sgt. Mildred Adams retaliated against me in a number of ways to include:

A.   Retaliation for writing grievances to access court. [FN21]

B.   Retaliation for running in the election for a grievance hearing committee position (Appendix Two-B).

C.   Retaliation for being an American Indian (Appendix Two-A). [FN22]

The retaliation resulted in violations of my First, Fifth, Sixth, and Fourteenth Constitutional Amendment Rights, causing me unnecessary emotional distress.

## STATEMENT OF FACTS IN CLAIM NUMBER FOUR
## AGAINST DEFENDANT MICHAEL PETERSEN (CHAPLAIN)

83.   The Plaintiff has attached **four** fully exhausted grievances against Chaplain Petersen and **three** unexhausted grievances, see (FN13), *supra*, as well as multiple exhibits in the Appendix which will fully support all of his positions and claims herein.

84.   Defendant Chaplain Michael Petersen is a licensed Pentecostal pastor. He is a firm believer in the doctrine that if you are not Pentecostal, you will not be allowed into Heaven. Defendant Petersen made that clear to me one day when he attempted to proselytize to me. [FN23] Mr. Petersen told me I should give up my Pagan beliefs and pick up a Bible. First, American Indians are not Pagans. Pagans

---

[FN21] Vaughn v. Trotter, 516 F.Supp. 886, 893 (M.D. Tenn. 1980) and Smith v. Mascher, 899 F.2d 940, 947 (10th Cir., 1990), holding that prison officials may not retaliate against or harass an inmate because of inmate's exercise of his right to access courts.
[FN22] See Tennessee Code Annotated 39-17-309, Civil Rights Intimidation; section (6), subsections (3), (4) (Appendix Seventy-Eight).
[FN23] Religious Programs Policy Index 118.01 clearly forbids Chaplains from proselytizing for their particular faiths. (Appendix Eighty-Two, Id. K.)

do not believe in any God. They are people who have no religion. American Indians believe in the Great Spirit, also known as "**Wakan Tanka**."

85.    Due to the fact that Mr. Petersen made promises to me, promises that were not kept, I voluntarily dismissed three pending grievances written against Mr. Petersen. (Appendix Seventy-Nine, (17) pages; Appendix Eighty, (4) pages; and Appendix Eighty-One, (3) pages.)

86.    During the period beginning September 2007 to the filing of this complaint, Defendant Petersen has done all things possible to deny me a meaningful American Indian/Native American Religious Program. He has denied religious items with no supported reasons (items which were eventually approved on December 12, 2008 by the TDOC Religious Activities Committee), he has failed to answer countless request forms, he specifically and intentionally verbally mis-advised me in his office of what I must do to submit a request for a Native American Religious Program to the Religious Committee and Dr. Ronald Turner, Ph.D., and has wholly ignored the First Amendment Right to Religion clause, the Equal Protection Clause of the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA). [FN24]

87.    Chaplain Petersen is liable under the provisions of the RLUIPA. The Northern District Federal Court recently confirmed that the RLUIPA protects prisoners in facilities run by for-profit prison companies. Dean v. Corrections Corporation of America, et al., No: 2:05CV31-M-B, March 28-2008, 2008 WL 85248, at #3 (N.D.Miss., March 28, 2008). (Appendix Eighty-Three, (7) pages.)

88.    On June 26, 2008, I wrote a grievance against Mr. Petersen for charging me for copies of the Commissioner's Handbook on Religious Practices for Native Americans, while he provided Wicca religious member Aaron Duchesne free copies from the same handbook. (Appendix Eighty-Four, (10) pages. The grievance and Aaron Duchesne's affidavit are a part of Appendix Eighty-Four.) Clearly, that is a violation of the Fourteenth Amendment's Equal Protection Clause, and it is obviously racially discriminatory against me as an American Indian. (Appendix Two A). [FN25]

---

[FN24] Cutter v. Wilkinson, 125 S.Ct. 2113 (2005) is the controlling case for prisons under the RLUIPA.
[FN25] Beerhide v. Suthers, 286 F.3d 1179, 1192 (10th Cir., 2002), denial of Equal Protection for requiring co-payment from prisoner requesting Kosher meals.

89.    On August 10, 2008, I wrote a grievance against Mr. Petersen because, as is his habit and routine practice (Fed.R.Evid. Rule 406), failed to respond to my renewed request to be allowed four yearly Feasts to celebrate the changing of the seasons. Mr. Petersen never answered the request. Previously, on January 19, 2007, Chaplain Petersen and Assistant Warden Sarah Rice denied my request for a Feast at the changing of the seasons. (Appendix Eighty-Six.) They claimed the TDOC Handbook does not allow a Feast because it is not "obligatory." However, the Wiccan Religious Group at HCCF/CCA are allowed to pick and choose two of their (8) Sabbaths in which they conduct a Food Feast, although the TDOC handbook does not list it as obligatory. The Wiccans had Feast in the Chapel on August 1, 2008 and November 1, 2008, in which Robert McCurdy, _____, one of the Chaplain's Aides (a Christian) helped pay for and participated in eating, as did Chaplain Aides Chris Hallum, _____, and Fred Dotson, _____, and of course Chaplain Petersen. As this Court will see, the Handbook of Religious Beliefs and Practices for Wicca, pages (120-123), makes no mention that the eight (8) major holy days, called Sabbaths, require a Food Feast. (Appendix Eighty-Seven, (4) pages.) [FN26]

90.    On June 29, 2008, I wrote a grievance against Mr. Petersen for not answering a request I had sent him on June 23, 2008. (Appendix Eighty-Eight, (15) pages.) The grievance is encompassed in Appendix Eighty-Eight, as is the June 23, 2008 request. The three (3) page grievance addressed Chaplain Petersen's systematic, unsupported denial of all aspects of a meaningful Native American Religious Program. Specifically see the May 23, 2008 certified three (3) page letter sent to Warden Easterling by me, discussing, in part, Chaplain Petersen and his complete denial and complete failure to cooperate with me in trying to establish a Native American Religious Program at HCCF/CCA. [FN27]

91.    On August 11, 2008, I wrote a grievance against Chaplain Petersen as a result of his August 5, 2008 response. (Appendix Eighty-Nine.) The August 5, 2008 response is encompassed in Appendix Eighty-Nine, and is also listed as Appendix Ninety. The August 5, 2008 response b Chaplain Petersen is simply **not true**. Chaplain Petersen stated that there has never been a Native American Service at this

---

[FN26] Wilson (Plaintiff herein) v. Moore, 270 F.Supp.2d 1328, 1353 (N.D. Fla, 2003). Equal Protection of the Law demands that similarly situated inmates be treated the same, and afforded Equal Protection of the Law.
[FN27] In the grievance, I specifically discussed Chaplain Petersen's habit of not answering request forms. Fed.R.Evid Rule 406.

26

facility. CCA Contract Attorney Curtis Hopper, whom I speak with every two weeks due to the fact that I work in the Law Library as a TDOC Certified Legal Aide, has told me on several occasions that the Hawaiian inmates, who were here through contract, conducted Native American Services. Mr. Hopper told me this on his last visit here on February 11, 2008, when we discussed a Sweat Lodge issue. Former Assistant Warden Sarah Rice also told me in September of 207 before she quit, that Hawaiians and inmates from Wisconsin, sent here by contract, conducted Native American Religious Services at HCCF/CCA. (See page (2), grievance in Appendix Eighty-Nine.) In that grievance I also put Chaplain Petersen on notice and made him fully aware of:

A.      Cutter v. Wilkinson, 125 S.Ct. 2113 (2005)

B.      Religious Land Use and Institutionalized Persons Act (RLUIPA)

C.      Fed.R.Evid. Rule 406, Habit and Routine Practice

D.      Sasnett v. Litscher, 197 F.3d 290, 292 (7th Cir., 1999)

E.      James Thunder Quill Wilson v. Moore, 270 F.Supp.2d 1328, 1352 (N.D. Fla., 2003)

F.      Youngbear v. Thalacker, 174 F.Supp.2d 902 (N.D. Iowa, 2001)

92.     Previously, on January 9, 2008, Chaplain Petersen denied my request for a Religious Bone Choker (Appendix Ninety-One), ignoring Equal Protection of the Law. Per Assistant Warden Rice's instruction, I submitted a typed request to Chaplain Petersen with six (6) attached documents in support of my request, dated October 29, 2007. (Appendix Ninety-Two.) In keeping with his usual habit of ignoring my request concerning Native American Religion, Mr. Petersen never answered the October 29, 2007 request. On January 2, 2008, I had my supervisor, Scott Williamson, contact Corrections Officer Bolyard, Assistant Warden Dodd's assistant, about the status of the October 29, 2007 religious request. Ms. Bolyard told me A.W. Dodd had given the request to Chaplain Petersen. Ms. Bolyard told Scott Williamson, who told me, that Chaplain Petersen doesn't know anything about my religious request. (See statements in second religious request, Appendix Ninety-Three, (2) pages). Therefore, I submitted a second religious request, which Ms. Bolyard personally delivered to Mr. Petersen. Within six (6) days, Chaplain Petersen denied my request, even though he was fully aware that the Native American inmates a the Turney Center Industrial Prison in Only, Tennessee are allowed to possess and wear Bone

27

Chokers. (See the two "Only Voice" news articles, encompassed in Appendix Ninety-Two.) In Chaplain Petersen's denial of the Bone Choker on January 9, 2008, he merely stated his reason for denial was

"A Bone Choker is not essential to the Commissioner's Handbook of Religious Practices (pgs 59-65)."

That vague, conclusory reason does not meet the Turner standard or the RLUIPA standard of review. (FN28)

93.     Six letters between me and Dr. Ronald Turner, Ph.D., designated Appendix Ninety-Four, describe Chaplain Petersen's last failed attempt to deny me (and other Native Americans at HCCF/CCA) a meaningful Native American Religious Program at HCCF/CCA. My letters to Dr. Turner are dated August 4, August 14, August 19, and August 20, 2008. Dr. Turner's letters are dated August 7 and August 25, 2008. The contents of those letters describe how Chaplain Petersen intentionally mis-advised me about what I had to include in my request for a Native American Religious Program at HCCF/CCA. Specifically see the August 19, 2008 letter, paragraph one, to Dr. Turner. Chaplain Petersen intentionally denied me basic tenets of my Native American Religious Faith for approximately (23) months when he began his baseless denials on January 7, 2007. (Appendix Eighty-Six.) Chaplain Petersen also intentionally failed to respond o requests, discarded a request that A.W. Dodd personally gave him, and intentionally mis-advised me of what had to be provided to the R.A.C. to have a Native American Program approved for me at HCCF/CCA. Further, he did all of this when he was fully aware that the Hawaiians and inmates from Wisconsin conducted Native American Religious services while at HCCF/CCA. On CCA letterhead, Chaplain Petersen sent his lie to Warden Easterling, A.W. Dodd, A.W. Kendrix, Chief Roberts, Asst. Chief Jones, all Captains, and me. (Appendix Ninety.) Obviously, Chaplain Petersen wanted all parties to know, including the Captains, that **Native Americans have NO religious rights at HCCF/CCA!** (Appendix Ninety.)

94.     Much to Chaplain Petersen's dismay, on December 12, 2008, the R.A.C. and Dr. Turner approved everything Chaplain Petersen had fought so hard to permanently deny when they approved a Native American Program for HCCF/CCA. (Appendix Ninety-Five.) The Bone Choker Chaplain Petersen

---

(FN28) Turner v. Safely, 482 U.S. 78, 89 (1987); RLUIPA of 2000, 42 U.S.C. 2000 CC et.seq. The RLUIPA re-established the compelling state interest/least restrictive means test.

denied was approved. (Id. page (3) at #7.) The Food Feasts were approved. (Id. page (4), at #14.) Also approved were sacred feathers, page (2) at #1, one hour per week Holy Ground Service, page (2) at #3, a one hour per week study group, Id. page (3) at #4, a medicine bag, Id. page (3) at #5, wearing of headbands, Id. page (4) at #6, donation of rattles and drums, Id. page (3) at #8, and designation of outside Holy Ground, Id. page (4) at #10. Had Chaplain Petersen been acting as an advocate in promoting religious programs for Native Americans as his job requires, instead of doing everything he could to deny me meaningful religious exercise, I would have begun to have basic tenets of my religious faith as far back as January, 2007. The delay was intentionally and maliciously done by Chaplain Petersen. [FN29]

95.    From January, 2007 until December 2008, Chaplain Petersen did everything he could to deny me my Native American Religious Rights under the First Amendment and Equal Protection Clause of the Fourteenth Amendment, but his malicious efforts failed on December 12, 2008. (Appendix Ninety-Five.) [FN30]

## EXHAUSTION

96.    Plaintiff has exhausted all available administrative remedies regarding the matters described in this complain against Defendant Petersen. Copies of the Plaintiff's grievances and appeals are attached to this complaint and listed in the Appendix as: Appendices Eighty-Four, Eighty-Six, Eighty-Eight, and Eighty-Nine.

---

[FN29] In Wilson v. Moore, 270 F.Supp.2d 1328 (N.D. Fla., 2003), the case that I litigated for a period of four (4) years and nine (9) months and prevailed in with an out-of-court monetary settlement in June of 2003, U.S.M.J. William Sherrill stated, Id. at 1347, V. Analysis: "It is undisputed that Plaintiff's Native American Spiritual Beliefs are of great importance to him. See Doc. 141, exhibits. There is also no question that Plaintiff has significant constitutional rights concerning the exercise of his religious beliefs." Those Spiritual Beliefs are still of great importance to me and always will be.

[FN30] There is not a shadow of right in the general government to intermeddle with a religion. Its least interference with it would be a most flagrant usurpation. See General Defense of the Constitution, June 12, 1788), reprinted in 11 Papers of James Madison 130, (R. Rutland, C. Hobson, W. Rachal, and J. Sisson, eds., 1977).

## STATEMENT OF CLAIM FOR DEFENDANT PETERSEN
## IN CLAIM NUMBER FOUR

97.    Defendant Petersen intentionally and maliciously denied and delayed my First Amendment Right to Freedom of Religion. As previously described in paragraphs (83) through (95) herein, Defendant Petersen denied, delayed, and utilized lies to deny me meaningful Native American Religious Expression.

98.    Defendant Petersen intentionally and maliciously delayed me meaningful Religious Expression for Native Americans as described in paragraphs (83) through (95) herein, and gave no consideration to the religious protections I am entitled to under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). Defendant Petersen completely ignored the RLUIPA's compelling state interest/least restrictive means test. See (FN28), *supra.*

## STATEMENT OF FACTS IN CLAIM NUMBER FIVE AGAINST DEFENDANTS
## RONALD TURNER, GAYLE RAY, DEBBIE INGLIS, FLORA HOLLAND, KEN LOCKE,
## PAT RYAN, DEAN YANCY, TIM COLEMAN, AND MICHAEL PETERSEN

99.    The Plaintiff has exhausted his remedies to the highest order in the TDOC for purposes of requesting a Native American Religious Sweat Lodge. (Appendix Ninety-Five.) See (FN13), *Supra.* The R.A.C. granted nine (9) of the Plaintiff's requests on December 12, 2008. The construction and use of the Sweat Lodge  was disapproved based on the mere assertion that "it would jeopardize institutional safety and security." (Id. page (2) at #2, Appendix Ninety-Five.) [FN31] Also disapproved were the requests for donation of one Prayer Pipe, Id. page (3) at #9; Kinnick-Kinnick (mixture of herbs) to be smoked in ceremonial pipe service, Id. page (4) at #11; smudging materials such as cedar, sage, and sweetgrass, Id. page (4) at #12; and weekly pipe ceremonies. All requests were denied on the basis of the TDOC Smoke-Free Policy #112.01. See (FN13), *supra.* The TDOC Policy #112.01 addresses **tobacco.** I

---

[FN31] Farrow v. Stanley, 2005 WL 2671541 (D.N.H.), Id. at page (9), prison officials "cannot merely brandish the words "security" and "safety" and expect that their actions will automatically be insulated from scrutiny. Campos v. Coughlin, 854 F.Supp. 194, 207, (S.D.N.Y. 1994); also see Werner v. McCotter, 48 F.3d 1476, 1480 (9th Cir., 1995): "'[T]he state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health and safety to establish that its interests are [compelling].'" (Quoting Jago v. Weaver, 675 F.2d 116, 119 (6th Cir., 1982).

specifically requested to be allowed Kinnick-Kinnick, Id. page (2) at #11, Appendix Ninety-Five, and cedar, sage, and sweetgrass, Id. page (2) at #12, Appendix Ninety-Five. All four items, Kinnick-Kinnick, cedar, sage, and sweetgrass **do not contain tobacco**, plus, I requested to use the items **outside** at the Holy Ground ceremonies, not in the Chapel or any prison building at HCCF/CCA. [FN32] The Holy Ground was approved, Id. page (2) at #3, Appendix Ninety-Five. The R.A.C. obviously did not consult with any Native Americans in the Community for advice and opinion; had they, they would have realized that Kinnick-Kinnick is tobacco-free, and is a mixture of herbs. [FN33] The allowances given to the Sacred Circle in (FN33) is exactly what I requested and was denied. See (FN13), *supra*. Both Tennessee and New Hampshire are smoke-free prison systems. Equal Protection of the Law requires similarly situated persons to be allowed the same forms of relief and activities. I have been discriminated against by all R.A.C. members named herein, and by Chaplain Petersen, based on my chosen, inherited, and sincere Religious Beliefs. [FN34]

100.    The R.A.C. disapproved my request for construction and use of a Sweat Lodge, claiming it would jeopardize institutional safety and security, a mere vague, overbroad, and conclusory claim with no federal support. (Appendix Ninety-Five, Id. page (2) at #2.) That disapproval will not float for two specific reasons:

A.    It violates the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). [FN35]

B.    Corrections Corporation of America operates and manages Hardeman County Correctional Facility. Corrections Corporation of America financed, designed, built, and manages Crossroads Correctional Facility. Crossroads provides and operates a Sweat Lodge for Native Americans at that facility. (Appendix Ninety-Six.)

---

[FN32] Farrow v. Stanley, 2005 WL 2671541 (D.N.H.), Id. at page (5), all DOC facilities (New Hampshire) are tobacco free, and prison officials reached the decision to use Kinnick-Kinnick as a tobacco substitute after they consulted with several members of the Native American Community.

[FN33] Farrow v. Stanley, 2005 WL 2671541 (D.N.H.), Id. at page (2), Sacred Circle members may use the herb blend Kinnick Kinnick, sage, and sweetgrass.

[FN34] Thunder Quill Wilson v. Moore, 270 F.Supp.2d 1328, 1353 (N.D. Fla., 2003).

[FN35] Cutter v. Wilkinson, 125 S.Ct. 2113, 2116 (2005). Section three of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA or "Act"), 114 State. 804, 42 U.S.C. § 2000 CC-!(a)(1)-(2), provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by the "least restrictive means."

101.    The R.A.C. has clearly violated the Equal Protection clause of the Fourteenth Amendment. They were fully aware that other CCA facilities allowed Sweat Lodges and had no security concerns. The Defendants' action in disapproving the Sweat Lodge request were not negligent, they were intentional. (FN36)

102.    The defendants intentionally disapproved my request for a Sweat Lodge, knowing full well other CCA facilities allowed Sweat Lodges, which resulted in a lengthy delay in construction of a Sweat Lodge at HCCF/CCA. I requested to be allowed a Sweat Lodge as far back as May 23, 2008 in my (3) page letter to Warden Easterling, encompassed in Appendices (79) and (88), and renewed it in my request to the R.A.C. on August 4th, 2008, (Appendix 94), which was eventually denied on December 12, 2008, a denial of Equal Protection of the Law (U.S.C.A. 14, clause 1), and my First Amendment Right to Free Exercise of Religion. (FN37)

103.    In my request to the R.A.C., I requested four (4) yearly feasts to celebrate the Summer and Winter Solstices and the Spring and Fall Equinoxes. (Appendix Ninety-Five, Id. page (2) at #14.) That request was approved in part and denied in part. See (FN13), *supra*. (Appendix Ninety-Five, Id. page (4) at #14.) The R.A.C. approved only two yearly feasts, not specifying which ones are allowed and giving absolutely **no** reason for the denial of the four yearly feasts and approving only two yearly feasts. In denying four yearly feasts, which are Sacred Holidays to Cherokees and many Native American tribes, and allowing only two feasts per year, the Defendants have violated the <u>RLUIPA of 2000</u>, the free exercise of religions under the First Amendment, and the Equal Protection clause of the Fourteenth Amendment. In regard to Equal Protection, the Wicca group here at HCCF/CCA observe what are known as Sabbaths. (FN38) The Wicca group has eight yearly Sabbaths. Four of their Sabbaths are on the Summer Solstice (or Litha) and Winter Solstice (or Yule), and the Spring and Autumn Equinoxes, sometimes called Ostara and Mabon. (Appendix Ninety-Seven, (2) pages, Id. Ritual Occasions.) Wicca only began to be compiled no earlier than the 1920's, and have only been popularized since 1954.

---

(FN36) <u>Youngbear v. Thackler</u>, 174 F.Supp.2d 902, 916 (N.D. Iowa, 2001). There can be no "negligent" violations of an individual's right to equal protection. Rather, only deliberate discrimination violates equal protection. See <u>McClesky v. Kemp</u>, 481 U.S. 279, 292 (1987).

(FN37) <u>Youngbear v. Thackler</u>, 174 F.Supp.2d 902, 916 (N.D. Iowa, 2001). In summary, the District Court, Judge Bennett, Chief Judge, held that: (1) the year-long delay violated the Native American inmates' First Amendment free exercise of religion rights.

(FN38) See Appendix Eighty-Seven at page 120, Id. Group, at paragraph (1).

(Appendix Ninety-Eight.) Yet Native Americans have been feasting, celebrating their holidays in North America (Turtle Island) for over 30,000 years, but the R.A.C. denies me and Native Americans our four yearly feasts, while allowing a Wiccan group, who only became popularized in 1954, to celebrate the **same four yearly feasts I am denied**. Apparently, the R.A.C. and Chaplain Petersen prefer **Pagans** over Native Americans.

104.    As a part of the R.A.C.'s December 12, 2008 Conditional Approvals (appendix Ninety-Five), the R.A.C. made it a requirement that an outside vendor must be approved to purchase certain items from. Id. page (2) at #1; page (3) at #6 and #7. Prior to the December 12, 2008 Approval, I was allowed to receive Religious Items from my Klan Mother Sunny War Eagle (Appendix Ninety-Nine) and from Cherokee Yvonne "Bright Star" Sanders. (Appendix One Hundred.) Due to the unwarranted restrictions and problems with getting vendors approved, to date no vendor wants to deal with the Tennessee Department of Corrections. I have gone through the process described in the request form I wrote to Chaplain Petersen (Appendix One Hundred) and the affidavit by Yvonne "Bright Star" Sanders. (Appendix One Hundred One.) As stated in MS. Sanders' affidavit, Mr. Silcox told her that the TDOC prefers to deal only with Union Supply Company. Union Supply sells **no** Native American items. I contacted **Noc Bay Trading Company** and **Cherokee Publications** with my requests (Appendices One Hundred Two and One Hundred Three). The TDOC has promulgated rules which are a substantial burden on my religious faith, making it impossible to purchase Native American Religious Items. [FN39]

105.    On February 20, 2009, the Wiccan group conducted a feast for one of their eight Sabbaths. Chaplain Petersen was sent money through the Inmate Trust Fund account by John Gough, 374864 and Chaplain's Aide Robert McCurdy, _____. However, neither McCurdy nor Gough are Wiccan members listed on TDOC TOMIS. They are both Christians. After the feast, Gough brought back Chocolate Ice Cream, Strawberries, and a large bag of groceries to include hamburgers, buns, lettuce, and tomatoes to his cell, JC-109. I live in JC-103, and observed Gough come in with the food and observed him eating it in JC-109. Gough told me he and McCurdy purchased the food for the Wiccan group so they could eat

---

[FN39] Perez v. Frank, 433 F.Supp.2d 855 (W.D. Wis., 2006) at 967, Id. order, granted, (a), Respondents Mault, Faust, Tegels, and Raemisch violated his rights under the RLUIPA and the Free Exercise clause of the First Amendment by promulgating and enforcing policies that deprived him of the ability to possess adequate quantities of prayer oil.

"all we want." The problem here is threefold. First, it is against institutional policy to bring back food from a feast to a cell. (Gough told me Chaplain Petersen okayed it, and wrote him a pass to do so.) Second, what are Christians doing sending Chaplain Petersen money for Wiccan Feasts? Three, in the R.A.C.'s decision to allow Native Americans (2) yearly feasts per year versus the requested and required (4) feasts per year, the R.A.C. made it mandatory that **anyone** participating in the feast **must** be listed under Religion in the TDOC TOMIS as Native American. (Appendix Ninety-Five at page (4), Id. #14.) Clearly, Equal Protection of the Law is not afforded to Native Americans here at HCCF/CCA. [FN40] **Note:** Do not construe this as complaining about these men doing whatever it takes to get some good food at HCCF/CCA. Obviously all parties have utilized the Religious Department to manipulate a meal. My complaint is, why do inmates have to be listed as Native American on TDOC TOMIS to participate in Holy Feast when it does not apply to Wiccans, and Christians Gough and McCurdy pay for it and benefit from a Holy Sabbath when they are not Wiccans, but gluttons.

## STATEMENT OF FACTS IN CLAIM NUMBER SIX
## AGAINST DEFENDANT MICHAEL PETERSEN

106.    On June 28, 2008, Chaplain Michael Petersen came to the HCCF/CCA library at approximately 1:00 PM, and, in a loud voice, berated me repeatedly in front of the entire staff and patrons as a result of my writing requests and grievances in order to establish a Native American Program at HCCF/CCA. [FN41] (Appendix One Hundred Four.) On June 30, 2008, Chaplain Petersen again came to the library. This time, Chaplain Petersen deliberately gave Muslim inmate Willie Pegues, 202286, information in order for the Muslim group to retaliate against me. (Appendix One Hundred Four.) Mr. Nichols, one of my co-workers, told me what Petersen had done and said, so I asked him to write an affidavit about it. He did so. (Appendix One Hundred Four.) For months after Petersen's conversation I was intimidated as to what might happen to me every time I was crossing paths with Muslim inmates in the hallways of HCCF/CCA, especially when traveling in groups.

---

[FN40] Wilson v. Moore, 270 F.Supp.2d 1328, 1353 (N.D. Fla., 2003).
[FN41] Wilson v. Silcox, 151 F.Supp.2d 1345, 1351 (N.D. Fla., 2001). "Litigation undertaken in good faith by a prisoner motivated to bring about social change and protect constitutional rights in the prison is at the core of the First Amendment protections."

107.    On February 11, 2009, I wrote Assistant Warden Kendrix and complained about Chaplain Petersen's lack of cooperation and deliberate attempts to derail the Native American Religious Program. (Appendix One Hundred Five.)

108.    On February 18, 2009, Chaplain Petersen exploded into a (15-20) minute tirade, screaming at me while pounding his fist on his desk. (Appendices One Hundred Six and One Hundred Seven.) The Study Group met at 1:00 PM in the Chapel. At that time, Chaplain Petersen called me into his office, told his clerk to "get," and slammed the door. He immediately began screaming at me about me writing the February 11, 2008 letter to Assistant Warden Kendrix. Aside from this, he went on and on, screaming at me, pounding his fist repeatedly in regard to the problems I had caused him in the last year and one-half. About ten (10) minutes into the conversation he told me I'd "better watch my step because any more letters or grievances and [I'd] be sorry, and that's that." I asked him what he meant by that, and he responded "just keep it up and see what happens." Since I felt threatened by Petersen, I finally got out of his office and we disbanded our scheduled one (1) hour and thirty (30) minute meeting immediately. Other members of the Native American group felt threatened, specifically Mr. Lawler and Mr. Johnson, and have decided not to attend the Religious Study Group in the future. (See Appendix One Hundred Eight.)

109.    Chaplain Petersen named me specifically to inmate Cornell Poe on the afternoon of his tirade as the "long-haired silver devil." (Appendix One Hundred Nine.) During the conversation  with Mr. Poe, Chaplain Petersen solicited Mr. Poe to assault me or have someone else assault me. (Appendix One Hundred Nine.) Once again, Petersen has deliberately put me on guard for an attack because I seek my First Amendment Religious Rights. [FN42] Chaplain Petersen has run at least two (2) people off from the Study Group and has threatened me with bodily harm for the second time since June, 2008.

110.    On February 20, 2009, in-house inmate minister John Gough, #374864 was told by Chaplain Petersen that he was arranging for the "silver haired devil" James Wilson to be transferred to the Turney Center Prison using the reason "there are more Indians there." First, Tennessee does not transfer

---

[FN42] Meyer v. Teslik, 411 F.Supp.2d 983, 984 (N.D. Wis., 2006). Punitive damages could be assessed against Chaplain of state prison, in suit by inmate alleging abridgment of his right to practice Native American Religion, in violation of First Amendment and Religious Land Use and Institutionalized persons Act (RLUIPA), if it was proved that Chaplain told inmate that if he persisted in threatening litigation, Chaplain would take steps to keep inmate from attending Native American Religious Events.

35

inmates for religious purposes. If they did, all an inmate would have to do is say "I want to go to whatever prison," because there are more Muslims there, or more Mennonites. Gough's cellmate in cell JC-109, David Saldivas, 384986, is Cherokee/Pueblo, and a member of the Native American Religious group. Saldivas came to me and told me what Petersen had told Gough about my retaliatory transfer. I immediately wrote request forms to Warden Easterling, Assistant Warden Kendrix, Chaplain Petersen, and Unit Manager Ester, and advised them I was aware of the planned retaliatory transfer. (Appendix One Hundred Ten A, B, C, and D.)

111.    On February 23, 2009, my friend Yvonne "Bright Star" Sanders contacted CCA Contract Attorney Curtis Hopper and my friend Attorney Michael Working, 8 South Third Street, Suite 400, Memphis, Tennessee 38103, about the planned retaliatory transfer. Also contacted was my Appellate Attorney Greg Smith of Clarkesville, Tennessee. Mr. Working contacted Warden Easterling on February 25, 2009. CCA Contract Attorney Curtis Hopper verified to me when we met on February 25, 2009 that there is no such thing as a Religious Transfer "because there are more Indians there." The Warden and both Assistant Wardens have been fully advised of the retaliatory transfer and Petersen's violent behavior.

## EXHAUSTION

112.    I have made the following parties aware of Petersen's violent behavior, threats, and retaliatory actions. (See Appendices named in Claim Six.) See (FN13), *supra*.

## STATEMENT OF CLAIMS FOR DEFENDANT MICHAEL PETERSEN IN CLAIM SIX

113.    Defendant Petersen has blatantly and deliberately violated my First and Eighth Constitutional Amendment Rights. In regard to the First Amendment, he has willfully and knowingly, and with malicious intent, denied and delayed me Free Exercise of Religion. He has done everything he can to delay my Religious Rights, and now that the program is approved, he is doing all he can do to destroy the program. He has intentionally inflicted emotional distress on me for two years now by denying my Religious Request for meaningful Religious Worship. In regard to the Eighth Amendment, Petersen has established a documented pattern of physical threats against me. He has twice solicited inmates to

36

cause me bodily harm. (See Nichols and Poe Affidavits.) This is a clear violation of the Eighth Amendment, Cruel and Unusual Punishment. There is no doubt Petersen intends to carry out his threats against my well-being by having me assaulted or in the worst case, killed.

## SUMMARY OF CLAIM ONE

114.    Defendants Stipanuk, Buford, and Clark are sued in their official capacities for injunctive relief and in their individual capacities for monetary damages as a result of the **physical injury, pain, and lifelong disabilities** I have incurred as a result of their deliberate indifference to my serious medical needs, as described in paragraphs (34) through (57) herein. The Defendants were fully aware of my need for adequate medical treatment, yet they have refused to treat me for Hepatitis C virus, Acid Reflux, and Throat Cancer. The defendants were fully aware that my glucose level was dangerously elevated and that I needed treatment for Type Two Diabetes. Thirty-Five (35) days after I found out my glucose was dangerously high, I began treatment with the medications Glyburide and Metaforum, and began monitoring my glucose level daily. On August 4, 2008, my monitoring was reduced to twice per week, A.M. and P.M., Tuesdays and Fridays. As a result of not being informed that my glucose level was dangerously high until I brought it to Medical's attention, I have incurred symptoms of Cancer of the Pancreas, to include abdominal pain and nausea; Diabetic Nephropathy due to untreated high glucose level (Appendix One Hundred Eleven); Pancreatitis, to include intense pain in the upper abdomen and nausea; and Ketoacidosis, due to the untreated period of time I went without treatment, causing me diarrhea and vomiting. (Appendix One Hundred Twelve.) I have developed symptoms of Kidney Cancer, to include lower back pain, high blood pressure, nausea, and fatigue. I have been diagnosed with Hepatitis C virus, and have most all of the igniters which indicate I should be treated with Interferon and Ribovarin. (Appendix One Hundred Thirteen.)

115.    On July 17, 2008, I had an appointment with Dr. Citrian Crismaru. I requested that he order tests for me to analyze and diagnose my Pancreas, Kidneys, and any other vital organ that may have sustained damage due to me not being told that my glucose level was extremely elevated since at least February 19, 2007. Dr. Crismaru told me it was up to HSA Barbara Buford to decide and approve

37

requests due to her budgetary concerns. The vital organs are illustrated in Appendix One Hundred Fourteen. However, when I wrote HSA Buford, she told me it was up to Dr. Crismaru to order tests. Needless to say, I was never tested for any of the previously described serious ailments and/or diseases. See FN3, *supra*.

## **PRAYER FOR RELIEF**

116.    Dr. Gerald Stipanuk is sued in his individual capacity for compensatory damages in the amount of $50,000.00.

117.    Dr. Gerald Stipanuk is sued in his individual capacity for punitive damages in the amount of $150,000.00.

118.    Patsy Clark is sued in her individual capacity for compensatory damages in the amount of $50,000.00.

119.    Patsy Clark is sued in her individual capacity for punitive damages in the amount of $50,000.00.

120.    Patsy Clark is sued for nominal damages in the amount of $1.00.

121.    Barbara Buford is sued in her individual capacity for compensatory damages in the amount of $50,000.00.

122.    Barbara Buford is sued in her individual capacity for punitive damages in the amount of $50,000.00.

123.    Barbara Buford is sued for nominal damages in the amount of $1.00.

124.    Barbara Buford is sued in her official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for:

A.    Interferon Injections and Ribovarin Capsules for treatment of Hepatitis C virus.

B.    An appointment with a Throat Cancer Specialist (doctor) and the proper X-ray to diagnose Throat Cancer.

C.    My prescription renewed for Zantac due to my diagnosed Acid Reflux.

D.    A prescribed modified diet for my Type Two Diabetes, due to my medication, Glyburide.

The injunctive relief must be sought through HSA Barbara Buford because Defendants Stipanuk and Clark no longer work at HCCF/CCA.

## SUMMARY OF CLAIM TWO

125.    In Claim Number Two I only seek nominal damages and injunctive relief in the form of requesting that my teeth be cleaned ASAP and once per year after the initial cleaning.

## PRAYER FOR RELIEF

126.    HSA Barbara Buford is sued in her official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the relief described in the Summary of Claim Two, *supra*.

## SUMMARY OF CLAIM THREE

127.    In Claim Number Three the sole Defendant is Sergeant Mildred Adams. She is sued in her individual capacity for punitive damages only for her intentional and malicious retaliation against me for writing grievances and being a Native American/American Indian. (See Appendix Two B.) She is also sued for nominal damages as described in paragraphs (69) through (82) herein.

## PRAYER FOR RELIEF

128.    Sergeant Mildred Adams is sued in her individual capacity for punitive damages in the amount of $25,000.00.

129.    Sergeant Mildred Adams is sued for nominal damages in the amount of $1.00.

## SUMMARY OF CLAIM FOUR

130.    Defendant Petersen is sued in his individual capacity for punitive damages as a result of his intentional and malicious behavior described in paragraphs (83) through (95) herein.

## PRAYER FOR RELIEF

131.    Defendant Petersen is sued in his individual capacity for compensatory damages in the amount of $1.50. (See Appendix Eighty-Four.)

132.    Defendant Petersen is sued in his individual capacity for punitive damages in the amount of $5,000.00. (If any award is granted from Defendant Petersen, it is to be placed in a fund for the further development of the Native American Religious Program and provide money for Feasts and to purchase Religious Items for Indigent Native Americans.)

133.    Defendant Petersen is sued in his official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

134.    Defendant Petersen is sued for nominal damages in the amount of $1.00.


## SUMMARY OF CLAIM FIVE

135.    In Claim Number Five, I seek punitive and nominal monetary damages and injunctive relief against Defendants Ronald Turner, Gayle Ray, Debbie Inglis, Flora Holland, Ken Locke, Pat Ryan, Dean Yancy, Tim Coleman, and Michael Petersen, for the Constitutional violations described in paragraphs (99) through (105) herein.


## PRAYER FOR RELIEF

136.    Defendant Ronald Turner is sued in his individual capacity for punitive damages in the amount of $1,000.00.

137.    Defendant Ronald Turner is sued for nominal damages in the amount of $1.00.

138.    Defendant Ronald Turner is sued in his official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the

construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

139.   Defendant Gayle Ray is sued in her individual capacity for punitive damages in the amount of $1,000.00.

140.   Defendant Gayle Ray is sued for nominal damages in the amount of $1.00.

141.   Defendant Gayle Ray is sued in her official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

142.   Defendant Debbie Inglis is sued in her individual capacity for punitive damages in the amount of $1,000.00.

143.   Defendant Debbie Inglis is sued for nominal damages in the amount of $1.00.

144.   Defendant Debbie Inglis is sued in her official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

145.   Defendant Flora Holland is sued in her individual capacity for punitive damages in the amount of $1,000.00.

146.   Defendant Flora Holland is sued for nominal damages in the amount of $1.00.

147.   Defendant Flora Holland is sued in her official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the

41

construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

148. Defendant Ken Locke is sued in his individual capacity for punitive damages in the amount of $1,000.00.

149. Defendant Ken Locke is sued for nominal damages in the amount of $1.00.

150. Defendant Ken Locke is sued in his official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

151. Defendant Pat Ryan is sued in their individual capacity for punitive damages in the amount of $1,000.00.

152. Defendant Pat Ryan is sued for nominal damages in the amount of $1.00.

153. Defendant Pat Ryan is sued in their official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

154. Defendant Dean Yancy is sued in his individual capacity for punitive damages in the amount of $1,000.00.

155. Defendant Dean Yancy is sued for nominal damages in the amount of $1.00.

156. Defendant Dean Yancy is sued in his official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the

construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

157.    Defendant Tim Coleman is sued in his individual capacity for punitive damages in the amount of $1,000.00.

158.    Defendant Tim Coleman is sued for nominal damages in the amount of $1.00.

159.    Defendant Tim Coleman is sued in his official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

160.    Defendant Michael Petersen is sued in his individual capacity for punitive damages in the amount of $1,000.00.

161.    Defendant Michael Petersen is sued for nominal damages in the amount of $1.00.

162.    Defendant Michael Petersen is sued in his official capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction for the construction of a Sweat Lodge; the use of Kinnick-Kinnick, sage, cedar, and sweetgrass; the approval of outside Klan Mothers, Klan Fathers, and Tribal Members to be allowed to provide Religious Items such as Bone Chokers, Medicine Bags, Feathers, Medicine Wheels, etc., to me and Native Americans; to be allowed four yearly feasts; and to be allowed a donated or purchased Prayer Pipe.

## SUMMARY OF CLAIM SIX

163.    In Claim Number Six I seek punitive and nominal monetary damages and injunctive relief against Defendant Michael Petersen for the Constitutional violations described in paragraphs (106) through (113) herein.

## PRAYER FOR RELIEF

164.    Defendant Michael Petersen is sued in his individual capacity for punitive damages in the amount of $250,000.00.

165.    Defendant Michael Petersen is sued in both his official capacity and his individual capacity for injunctive relief in the form of a Preliminary Injunction (Fed.R.Civ.P. Rule 65(b)) and subsequently a Permanent Injunction to stop his threats against my life and to stop causing me emotional distress due to his solicitation of inmates to cause me bodily harm.

## OATH

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct: 28 U.S.C. 1746.

_February 25, 2009_
Executed on:

James Thunder Quill Wilson, 361111, *Pro Se*
HCCF/CCA, P.O. Box 549
Whiteville, Tennessee, 38075-0549

## CERTIFICATE OF SERVICE

I hereby certify that I have mailed the original of the foregoing to the United States District Court, Western District, Deputy in Charge Sonya Pettigrew, Room 262, 111 South Highland Avenue, Jackson, Tennessee 38301, by Certified Return Receipt Mail (Prison Mailroom), on this the 26th day of February, 2009.

James Thunder Quill Wilson, 361111